**OPERATIVE PLASTERERS & CEMENT MASONS INTERNATIONAL ASSOCIATION, AFL–CIO and Local 530 of Operative Plasterers & Cement Mason International Association, Plaintiffs,**

v.

**INTERNATIONAL BROTHERHOOD OF PAINTERS AND ALLIED TRADES, LOCAL UNION 1486 OF LONG ISLAND, International Brotherhood of Painters & Allied Trades, AFL–CIO, and District Council 9, Defendants.**

No. 97–CV–0435 (FB).

United States District Court, E.D. New York.

Feb. 17, 1997.

Brian E. Maas, Beldock Levine & Hoffman LLP, New York City, for Plaintiffs.

Michael J. Gan, Barr, Peer & Camens, Washington, DC (Tunick, Kupferman & Creadore, P.C., New York City; of counsel), for Defendants.

### *MEMORANDUM AND ORDER*

BLOCK, District Judge:

Plaintiffs Operative Plasterers & Cement Masons International Association and its affiliates ("Plasterers" or "Local 530") seek a court order requiring that defendants International Brotherhood of Painters and Allied Trades and its affiliates ("Painters" or "Local 1486") submit to arbitration in accordance with the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry ("National Plan"). Specifically, the Plasterers allege that Local 1486 is performing drywall finishing work known as "skimcoating" at the Nordstrom's Department Store construction project ("Nordstrom's Project") now in progress at Roosevelt Field, Long Island, and that accepting such work constituted a violation of Local 530's "jurisdiction," *i.e.*, entitlement to perform certain work tasks. The Plasterers further contend that Local 1486 has agreed to arbitrate this jurisdictional dispute, and that this Court should therefore enter an order requiring arbitration.

Although a National Plan arbitrator had previously concluded that this dispute was not arbitrable, this Court subsequently determined that the arbitrator lacked the authority to decide the arbitrability question. *Operative Plasterers & Cement Masons Int'l Ass'n, et al. v. International Brotherhood of Painters and Allied Trades, et al.,* 954 F.Supp. 563 (E.D.N.Y.1997) (Block, J.). In light of this holding, the Court framed the arbitrability issue as follows:

> (1) the employer, Island Taping, is not stipulated to the National Plan; (2) both unions in this dispute are affiliated with the National Plan; (3) both the Plasterers and Island Taping have agreed to be bound by the New York Plan; and (4) if Local 1486 is affiliated with the New York Plan, then all parties to this dispute are bound by the New York Plan, and consequently, all parties are bound to arbitrate under the National Plan on appeal from the New York Board's refusal to arbitrate. Accordingly, the Court must hold a hearing to determine *de novo* whether Local 1486 is affiliated with the New York Plan; if they are, then the present dispute is arbitrable under the National Plan.

*Id* at 567. Accordingly, the Court held a hearing on February 10, 1997 to receive testimonial and documentary evidence on this issue.

### THE HEARING

At the hearing, the Plasterers argued that Local 1486 is contractually bound to arbitrate before the Building & Construction Trades Council of Greater New York ("New York Board"), which administers the New York Plan for the Settlement of Jurisdictional Disputes ("New York Plan"). This agreement to arbitrate allegedly arises from a collective bargaining agreement ("the CBA") signed by the contractor, Island Taping, and defendant District Council 9 ("DC 9"). DC 9 is an umbrella organization that represents the Painters' local unions in the New York City metropolitan area. Prior to January 1995, DC 9 only represented local unions in the

five boroughs of New York City. As of that date, several affiliation agreements between DC 9 and local unions in the New York metropolitan area took effect, expanding DC 9's representation to include local unions in Nassau, Suffolk, and Westchester Counties.

One such affiliation agreement was executed between DC 9 and Local 1486 on December 22, 1994 ("Affiliation Agreement").[1] The Affiliation Agreement opens by stating that "Local Union # 1486 wishes to directly affiliate with District Council 9." Throughout the Affiliation Agreement, Local 1486 delegates authority and resources to DC 9, including: (1) Local 1486 trust funds are to be integrated with DC 9 trust funds; (2) DC 9 is given full authority to act as Local 1486's collective bargaining representative; (3) except for $20,000, all other assets of Local 1486 are transferred to DC 9; (4) Local 1486 agrees to be bound by all DC 9 bylaws; and (5) all Local 1486 members are now permitted to work anywhere in DC 9's jurisdiction, and DC 9 members are permitted to work in Local 1486's jurisdiction. *See* Affiliation Agreement ¶¶ 1–5. In keeping with this broad absorption of Local 1486 into DC 9, Robert Capaldo ("Capaldo"), President of Local 1486, became President of DC 9 in June of 1995, and helped negotiate the CBA.

The Plasterers focus on Article XXIV of the CBA, entitled "Jurisdictional Disputes." Article XXIV provides, in pertinent part: "[D]isputes between Trades and disputes relative to jurisdiction of Trades ... shall be adjusted in accordance with the principles of the New York Plan...." Pl. Exh. 1 at 43. The Plasterers argue that this language unambiguously requires all local unions affiliated with DC 9, including Local 1486, to arbitrate jurisdictional disputes pursuant to the New York Plan. At the hearing, the Plasterers summarized their position as follows:

> [PLASTERERS]: We believe Mr. Vagelatos's testimony made clear that District Council 9 is the bargaining representative; that the collective bargaining agreement on behalf of the workers do-

---

1. The Affiliation Agreement is entitled "Memorandum of Understanding." Subsequent to the February 10th hearing, the Court requested and received a facsimile copy of the Affiliation Agreement, which has been marked as Court Exhibit 1.

ing our work at the Nordstrom's site required the parties to resolve jurisdictional disputes under the New York Plan, and that that establishes affiliation for the purposes that we're here today, and that your Honor has every power to direct the arbitration.

THE COURT: 1486 is part of District Council 9. We weren't focused on District Council 9 for purposes of our initial decision. Now, by some process of absorption, since 1486 is part of District Council 9 and District Council 9 is part of the National Plan, that's pretty much how it works.

[PLASTERERS]: Affiliated with the New York Plan and, therefore, everybody was essentially obligated to appear at the New York Plan to resolve this and then follow the appeal to the National Plan.

Hr'g at 68.[2]

The Painters countered by arguing that despite Local 1486's affiliation with DC 9, Local 1486 is not bound to arbitrate jurisdictional disputes under the New York Plan because only local unions located within the five boroughs of New York City have agreed to arbitrate such disputes before the New York Board. The Painters proffer two reasons to support this conclusion. First, the Long Island building trades council ("Long Island Council") has exclusive authority to resolve jurisdictional disputes involving work performed by Local 1486. This contention, if true, would effectively preclude arbitration in this case. As the defendants' primary witness, Michael Monroe (General Executive Board Member and General Vice President, International Brotherhood of Painters and Allied Trades) candidly testified, plaintiff Local 530 has been prevented intentionally from joining the Long Island Council because "we [the Painters] have traditionally done the work." (Hr'g at 84). Since, as Mr. Monroe explained, Local 530 can only present a jurisdictional challenge to the Long Island Council if it is a seated member, the decision to keep Local 530 out of the council preserved Local 1486's "traditional" position in Long

Island. (*Id.* at 86) ("[T]hat's why 530 has not been seated by them. . . . They knew if they were seated there would be repeated disruptions on the job versus historical practice."). For all practical purposes, therefore, the Long Island Council's decision to exclude Local 530 was, in effect, a unilateral adjudication of the jurisdictional dispute.

Second, the Painters contend that the parties to the CBA never intended that local unions outside of New York City would be bound to arbitrate under the New York Plan. As Mr. Monroe further testified, "that language [of Article XXIV of the CBA] was specifically discussed and the intent of the parties, and I was there, at negotiations, and they knew the historical standing that I just gave to you, that in no way would that clause be used to adjudicate jurisdictional disputes anywhere other than the historic area of New York City." (*Id.* at 78).

## DISCUSSION

■ Since Local 530's exclusion from the Long Island Council precludes arbitrability of jurisdictional disputes through the Long Island Council, the issue before the Court is whether Article XXIV of the CBA constitutes an agreement by Local 1486 to arbitrate such disputes under the New York Plan, *i.e.,* "whether the reluctant party has breached his promise to arbitrate." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960). Interpretation of an arbitration clause of a collective bargaining agreement is governed by state contract law principles, although the Supreme Court has instructed district courts that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983).

■ Applying New York law, the threshold inquiry is whether the contract language is ambiguous. *See Curry Road Ltd. v. K Mart Corp.,* 893 F.2d 509, 511 (2d Cir.1990);

---

**2.** References to "Hr'g" are to the transcript of the hearing held before this Court on February 10, 1997.

*In re Barbier,* 752 F.Supp. 151, 156 (S.D.N.Y. 1990). If the CBA and, in particular, Article XXIV unambiguously requires Local 1486 to submit jurisdictional disputes to arbitration under the New York Plan, "the parties' rights ... should be determined solely by the terms expressed in the instrument itself 'rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable.'" *Care Travel Co. v. Pan Am. World Airways, Inc.,* 944 F.2d 983, 987–88 (2d Cir. 1991) (quoting *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir.1990)).

The Second Circuit has repeatedly held that "no ambiguity exists when contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Sayers v. Rochester Tel. Corp.,* 7 F.3d 1091, 1095 (2d Cir. 1993) (quotation omitted). Importantly, parties "may not create an ambiguity merely by urging conflicting interpretations of their agreement." *Id.; see also Harris Trust and Sav. Bank v. John Hancock Mut. Life Ins. Co.,* 970 F.2d 1138, 1147 (2d Cir.1992) ("[T]he fact that one party · may have a different interpretation of language does not make it any less plain."). Thus, although the parties may dispute the meaning of specific contract clauses, the Court's task "is to determine whether such clauses are ambiguous when 'read in the context of the entire agreement.'" *Sayers,* 7 F.3d at 1095 (quoting *W.W.W. Assocs. v. Giancontieri,* 77 N.Y.2d 157, 163, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990)).

Interpreting Article XXIV and the CBA as a whole, the Court determines that the only reasonable interpretation of this agreement is that *all* local unions represented by DC 9 are obligated to arbitrate jurisdictional disputes under the New York Plan. Notably, where the parties to the CBA wanted to draw distinctions between local unions on Long Island, in the Westchester/Putnam area, and in the five boroughs of New York City, they clearly so provided. For example, Article XI establishes rules and procedures

for the resolution of grievances between Island Taping and DC 9, and provides for three separate "Joint Trade Committees," each of which is assigned a geographic area. Those three areas are defined as "the historic New York City District Council No. 9 area, the Westchester and Putnam area, and the Local #1486 area." Pl. Exh. 1 at 19 (Art. XI, § 1). Although the procedures for each Joint Trade Committee are the same, this part of the CBA accordingly requires that grievances arising from events in one area be brought to the Committee located in that same area. *Id.* at 21 (Art. XI, § 5). If the parties wished to delimit Local 1486's affiliation with DC 9, or to preserve local autonomy for the resolution of jurisdictional disputes, they could have similarly drafted discrete provisions in the CBA or in any other relevant, binding agreement, especially since Capaldo, in·his dual capacity as President of Local 1486 and DC 9, was part of the CBA negotiations.

Undoubtedly, as Mr. Monroe explained, Local 1486's affiliation with DC 9 was not intended to create a vehicle for the Plasterers to oust the Painters from doing the work it has historically done on Long Island, which Local 1486 painstakingly sought to preserve by (1) excluding Local 530 from the Long Island Council; (2) stipulating Island Taping to the New York Plan, but not the National Plan; and (3) affiliating with the National Plan, but purportedly not the New York Plan. Nonetheless, because the Court has determined that Article XXIV is unambiguous on its face, extrinsic evidence of intent may not be considered. *See Care Travel Co.,* 944 F.2d at 988; *Garlick Funeral Homes, Inc. v. Local 100, et al.,* 413 F.Supp. 130, 135 (S.D.N.Y.1976) ("It is generally true that where contract language is unambiguous and subject to but one interpretation evidence of bargaining history may not be received to contradict that single meaning."). Therefore, Local 1486 is bound to arbitrate the jurisdictional dispute in accordance with the New York Plan.

Turning to plaintiffs' request for injunctive relief pending arbitration, the Court determines that, although it has the power to issue an injunction in aid of arbitration pursuant to *Boys Markets, Inc. v. Retail Clerks Union,* 398 U.S. 235, 90 S.Ct. 1583, 26

L.Ed.2d 199 (1970), the circumstances of this case do not yet warrant the issuance of a preliminary injunction. Unless and until the contractor Island Taping is joined in this dispute, the Court is unwilling to issue an injunction which may have an adverse impact on the progress and cost of the work. In any event, plaintiffs have yet to demonstrate the requisite irreparable harm to warrant injunctive relief. *See International Dairy Foods Ass'n v. Amestoy,* 92 F.3d 67, 70 (2d Cir. 1996). Nevertheless, the Court will retain jurisdiction should plaintiffs join Island Taping and establish that circumstances justify an injunction in aid of arbitration under *Boys Market.*

### CONCLUSION

The Court concludes that Article XXIV unambiguously requires that all local unions represented by DC 9, including Local 1486, must arbitrate jurisdictional disputes in accordance with the New York Plan. Therefore, this case is arbitrable, and must be sent back to a National Plan arbitrator for resolution on the merits of the jurisdictional dispute.[3]

**SO ORDERED.**

---

**3.** Since, as explained in the Court's prior decision, and as reconfirmed by the parties during the hearing, the New York Board "acquiesces to the [National Plan] to arbitrate this dispute," *Operative Plasterers,* —— F.Supp. at ——, 1997 WL 54549, at *1, the Court sees no need to engage in the futile gesture of first sending the jurisdictional dispute to the New York Board.